CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**BIG STONE GAP DIVISION**

MAY 2 4 2005

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

CARLA PENNINGTON,  )
          Plaintiff,  )
               )        Civil Action No. 2:04cv00074
               )
v.             )
               )        **MEMORANDUM OPINION**
               )
JO ANNE B. BARNHARDT,  )
COMMISSIONER OF    )        By:  GLEN M. WILLIAMS
SOCIAL SECURITY,    )        Senior United States District Judge
               )
          Defendant.  )


In this social security case, the court affirms the final decision of the Commissioner denying benefits.


*I. Background and Standard of Review*


In this case, plaintiff, Carla Pennington, ("Pennington"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Pennington's claims for supplemental security income, ("SSI"), under the Social Security Act, ("Act"), as amended, 42 U.S.C.A. § 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3) (West Supp. 2004).


The court's review in this case is limited to determining if the factual findings

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Pennington previously filed a claim for SSI on April 17, 2001, which was denied and not further pursued. (R. at 16.) Pennington filed this claim on October 23, 2002, alleging disability as of August 20, 2002, due to spinal stenosis, cervical spondylolisthesis, bone spurs, myeolodisplasia, disc herniation, osteophytes, herniation and mashing of the spinal cord. (R. at 48-51, 59-68.) The applications were denied initially and upon reconsideration. (R. at 32-34, 39-41.) Pennington then requested a hearing before an administrative law judge, ("ALJ"). (R. at 42.) Pennington testified at a hearing before an ALJ on October 30, 2003, at which she was represented by counsel. (R. at 206-24.)

By decision dated December 23, 2003, the ALJ denied Pennington's claim. (R. at 16-22.) The ALJ found that Pennington had not engaged in substantial gainful activity since the alleged onset of disability and that Pennington had chronic neck and back pain, both of which were impairments considered "severe" based on the requirements in 20 C.F.R. § 416.920(b)(2004). (R. at 21.) The ALJ determined that

-2-

these impairments did not meet or medically equal a listed impairment found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ also determined that Pennington's allegations regarding her limitations were not totally credible. (R. at 21.) The ALJ stated that he had carefully considered all of the medical opinions in the record regarding the severity of Pennington's impairments. (R. at 22.) The ALJ then found that Pennington retained the residual functional capacity to perform work at the light level of exertion[1] that would allow for frequent postural changes. (R. at 22.) The ALJ determined that Pennington was unable to perform any of her past relevant work and that she had no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case. (R. at 22.) Thus, considering Pennington's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed which she could perform. (R. at 22.) He concluded that Pennington was not under a "disability," as defined by the Act, at any time through the date of the decision. (R. at 22.) *See* 20 C.F.R. § 416.920(g) (2004).

After the ALJ entered his opinion, Pennington pursued her administrative appeals. (R. at 12.) After considering additional evidence submitted by Pennington, the Appeals Council denied her request for review. (R. at 5-7.) Pennington then filed this action seeking review of the ALJ's decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1491 (2004). The case is before this court on Pennington's Motion for Summary Judgment filed on January 14, 2005,

---

[1]20 C.F.R. § 416.967(b) (2004) defines light work as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." If an individual can do light work, she also can do sedentary work. 20 C.F.R. § 416.967(b) (2004).

(Docket Item No. 13), and the Commissioner's Motion for Summary Judgment filed on February 16, 2004, (Docket Item No. 16).

## II. Facts

Pennington was born in 1961, which classifies her as a younger person. 20 C.F.R. § 416.963(c) (2004). Pennington completed the tenth grade, (R. at 66, 209), and reported past work experience in a sewing factory. (R. at 61, 210.)

At her hearing, Pennington testified that she was disabled due to neck, back and blood pressure problems. (R. at 210-11.) She stated that she last worked in 1988 or 1989 as a bar-tacker in a sewing factory. (R. at 209-10.) Pennington said that her job required her to bend sometimes and to occasionally lift items weighing 10 to 20 pounds. (R. at 210.) Pennington also said that this was the only job that she had held in the last 15 years. (R. at 210.)

Pennington stated that her back was hurt in the lower back and sacroiliac area. (R. at 211.) Specifically, Pennington said that she had two disks removed in her lower back and one removed from her sacroiliac. (R. at 211.) Pennington stated that the back operation was performed on November 12, 2002, and that the doctors also performed a fusion, inserted a plate in her back, and used a harvest bone graft from a cadaver in the operation. (R. at 211.) Pennington told the ALJ that the operation helped her neck out a little bit to where she could turn her neck a little more than she had been able to in the past, but she also said that the pain was still there. (R. at 211-12.) Pennington further said that if she had to do it over again, she would not have

-4-

had the surgery because she had a lot of pain in her arms and shoulders, as well as blood pressure problems, after the surgery. (R. at 212.)

Pennington described the pain in her arms by saying that it radiated down into the fingers of her left arm,[2] as well as across the back of her right shoulder. (R. at 212-13.) She stated that Dr. Ken Smith, M.D., had told her that she needed to look into having more surgery on her back due to a disk protruding in the hip area. (R. at 220.) When asked whether she had discussed having surgery performed on her lower back and hips, Pennington said that she had not discussed that with her doctors, even though they wanted to talk to her about it, because she did not have enough money to pay for the surgery and did not have health insurance. (R. at 213.)

Pennington described the pain in her back and hips as a sensation where the areas would go numb and so painful that it was sometimes impossible to walk. (R. at 213-14.) Pennington said that every night she was in a lot of pain, which would require her to take pain medication; and if the pain was not eased Pennington said that she would take a second dose of pain medicine. (R. at 213.) Pennington also said that the pain radiated down both her legs into her feet on an almost constant basis. (R. at 213-14.) Pennington stated that she could not walk more than 100 yards without the pain affecting her, that she could stand for only eight or 10 minutes, and that she did not like sitting. (R. at 214.) Pennington said that when she sat her neck and lower back bothered her, and she could sit for only about 15 minutes at a time. (R. at 214.) Pennington also said that she could not pick up a gallon of milk, could not bend over at her waist and had trouble climbing stairs. (R. at 215.)

---

[2]Pennington also said that she was right-handed. (R. at 212.)

When asked about the medications she took to help her sleep, Pennington said that she took Soma. (R. at 216.) Pennington further said that she was taking Lortab for her pain, which helped some with the pain, though she suffered from side effects that included sleepiness and an upset stomach. (R. at 215.) Pennington also said that she took Xanax for her nerves, though she had never seen a counselor for them. (R. at 216.) Pennington said that she sometimes used a heating pad on her back and neck, and that the most time she would spend on her feet in a day would be an hour. (R. at 215-16.) Pennington also stated that she would not get much sleep at night. (R. at 216.)

Pennington then testified that except for doing minor dish washing, her children did the housework and that, while she went grocery shopping, she never went alone. (R. at 217.) Pennington also testified that she did not drive long distances and had given up going to church. (R. at 217, 19.) Pennington stated that she had gained weight due to her impairments. (R. at 219.)

When asked about her blood pressure problems, Pennington stated that she began having them at the same time she began having her neck and back problems. (R. at 218.) Pennington also said that her problems with her nerves began at the same time that she began having her neck and back problems. (R. at 218.) However, Pennington testified that she had not been to see Dr. Smith, her neurosurgeon, recently because she was not able to afford treatment. (R. at 218.)

Donna Bardsley, a vocational expert, testified next at Pennington's hearing. (R. at 221.) Bardsley described Pennington's past relevant work as a bar-tacker as light

and semi-skilled. (R. at 221.) The ALJ asked Bardsley what jobs would be available in the regional and national economy, assuming that he would find Pennington to be 42 years old with a tenth-grade education and past relevant work as a bar-tacker, that Pennington's work activities were restricted to light work,[3] and that Pennington needed a job that allowed frequent postural changes. (R. at 221-22.) Bardsley responded that Pennington could perform jobs as a cashier, of which there were 325 jobs in the region and 385,000 nationally; as an order clerk, of which there were 150 jobs in the region and 215,000 nationally; as an information clerk, of which there were 200 jobs in the region and 240,000 nationally; as a ticket seller, of which there were 220 jobs in the region and 300,000 nationally; as a hand packager, of which there were 225 jobs in the region and 350,000 nationwide; as a sorter, of which there were 200 jobs in the region and 240,000 nationally; and as an assembler, of which there were 185 jobs in the region and 255,000 nationwide. (R. at 222.) The ALJ then told Bardsley to assume that Pennington's pain would frequently interfere with her ability to concentrate and persist at work tasks, in addition to her other limitations. (R. at 222.) Bardsley responded that there would then be no jobs that would be available for her to perform. (R. at 222.) Bardsley also stated that none of the jobs she listed would allow Pennington to lie down due to pain. (R. at 222.)

In rendering his decision, the ALJ reviewed records from Dr. Patrick Molony, M.D.; Dr. Nathan Doctory, M.D.; Dr. Ken Smith, M.D.; Dr. Shiv Navani, M.D.; Dr. Subhash Saha, M.D.; Dr. David A. Sparks, M.D.; Dr. Donald. R. Williams, M.D.;

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2004).

Holston Valley Medical Center; and Lee County Community Hospital.

On April 2, 2001, Pennington went to Lee County Community Hospital, where she had her neck x-rayed. (R. at 93.) The x-ray showed normal alignment of vertebral body, severe discogenic changes at the C4-C5 and C5-C6 levels, loss of normal cervical lordotic curvature, anterior and dorsal osteophytic lipping, normal prevertebral soft tissues, no acute bony injury and well-marked degenerative changes involving apophyseal articulations between the C5-C6 and C6-C7 levels. (R. at 93.) Dr. Shiv Navani, M.D., diagnosed Pennington with well-marked hypertrophic changes of lower cervical spondyloarthrosis with discogenic changes at C4-C5 and C5-C6 levels. (R. at 93.)

On August 20, 2002, Pennington visited Dr. Patrick A. Molony, M.D., complaining of neck pain and pain down her left arm. (R. at 157.) Pennington stated that the pain started after she picked up her grandchild and heard a popping noise. (R. at 157.) A physical exam revealed tenderness to palpatation. (R. at 157.) Dr. Molony recommended she get her cervical spine x-rayed and prescribed her Ultram. (R. at 157.)

That same day, an x-ray was performed on Pennington's cervical spine at Lee Regional Medical Center. (R. at 99.) It showed that there was significant chronic disc disease and degenerative changes at the levels of C4, C5 and C6; that disc spaces were narrowed and prominent osteophyte was noted; that there was straightening of the curvature and a small density posterior to the spinous process of C6 probably due to calcification of soft tissue; and that no acute bony injury was noted. (R. at 99.) Dr.

-8-

Subhash Saha, M.D., diagnosed Pennington with moderate to marked degree of chronic disc disease at the level of C4, C5, and C6 and straightening of the curvature. (R. at 99.)

On September 3, 2002, Pennington visited Dr. Nathan Doctory, M.D., complaining of a neck injury she suffered in April of 2001. (R. at 102.) Dr. Doctory found that Pennington had cervical radiculitis, left greater than right and that C5-6 needed to be x-rayed for spondylitis. (R. at 103.)

On September 9, 2002, a CT scan was performed on Pennington's cervical spine by Dr. Saha at Lee Regional Medical Center. (R. at 106.) The CT scan revealed no definitive evidence of fracture, degenerative change in the facet joint, no significant abnormalities of the soft tissue or prevertebral soft tissues. (R. at 106.) Dr. Saha noted that it was difficult to rule out any disc herniation or disc bulging, and thus she recommended an MRI study for further evaluation. (R. at 106.) Dr. Saha also noted that Pennington had significant chronic disc disease in the mid cervical spine. (R. at 106.) She diagnosed Pennington with chronic degenerative changes in the cervical spine with no fracture. (R. at 106.)

Pennington visited Dr. Doctory again on September 17, 2002, at which time she complained that her neck was still stiff and she still had neck and back pain. (R. at 101.) Dr. Doctory reviewed Pennington's CT scan and concluded that she appeared to have spinal stenosis. (R. at 101.)

On September 29, 2002, an MRI was performed on Pennington's cervical spine

by Dr. Saha at Lee Regional Medical Center. (R. at 104-05.) The MRI showed significant chronic disc disease and degenerative changes at the levels of C4-C5 and C5-C6. (R. at 104.) Dr. Saha indicated that the MRI showed: disc bulging at the levels of C4-C5 and C6-C7 with associated prominent osteophyte giving extrinsic pressure over the spinal cord; a fair degree of narrowing in the spinal cord at that segment, but no acute focal herniation; minimal signal alteration in the spinal cord in the T2 multi-sequences, which indicated some inflammatory change or signal change in the spinal cord; possible neurological symptoms because of the signal change; fairly compromised nerve roots in the C4-C5 and C6-C7 levels, but more significantly in the C5-C6 level; and no other abnormalities were identified. (R. at 104.) Dr. Saha diagnosed Pennington with significant chronic disc disease and disc bulging with osteophyte giving extrinsic pressure over the spinal cord at the level of C4-C5 and C5-C6; minimal signal alteration in the spinal cord between C5 and C6, which could be associated with edema or inflammatory change in that part of the spinal cord; and compromised nerve roots, particularly at the level of C5-C6 and moderately at C4-C5. (R. at 105.)

Pennington visited Dr. Doctory again on October 3, 2002. (R. at 100.) Dr. Doctory diagnosed Pennington with spinal stenosis. (R. at 101.) Pennington called Dr. Doctory's office on October 9, 2002, asking for something to help her rest at night. (R. at 100.) Dr. Doctory instructed Pennington to take Benedryl when she went to bed. (R. at 100.)

Pennington visited Dr. Ken W. Smith, M.D., of the Blue Ridge Neuroscience Center on October 8, 2002. (R. at 112.) She complained of a two-year history of

cervical difficulties. (R. at 112.) Pennington told Dr. Smith that she had intermittent exacerbations of cervical pain which came and went depending on her activity level. (R. at 112.) Dr. Smith noted that Pennington had an acute onset of cervical pain in August, 2002, which began radiating into the left upper extremity after several days. (R. at 112.) Pennington complained of a deep aching sensation in the posterior cervical region radiating into the left shoulder, over the biceps groove, and into the forearm and hand, that affected all of the digits of her left hand. (R. at 112.) Pennington further described the pain as a deep aching sensation with associated burning, and because of the persistent and progressive nature of her symptoms she said she sought medical attention. (R. at 112.) Pennington also complained of a generalized weakness and numbness of both upper extremities, difficulty lifting her arms above her head or carrying out fine-motor movements with her hands, and severe numbness of the hands with fine-motor movements. (R. at 112.) She also stated that she had not undergone any structured physical therapy or received any oral or steroid therapy. (R. at 112.)

When asked about the history of her impairments, Pennington said that she had had lumbar difficulties for many years. (R. at 112.) She stated that she had chronic low back pain and had been experiencing weakness of her lower extremities with associated unsteadiness over the previous year. (R. at 112.) Pennington also stated that she had previous evaluations for low back pain with complaints of sharp shooting pains radiating into both lower extremities and had intermittent cramping in both lower extremities, which frequently woke her at night. (R. at 112.) However, Pennington could not identify any specific muscle group weakness, gait abnormalities, or bowel or bladder dysfunction. (R. at 112.) Dr. Smith noted that

Pennington had not undergone any structured physical therapy nor had received any steroid injections, but noted that she benefitted from daily walking. (R. at 113.)

Upon examination of the head and neck, Dr. Smith found moderate cervical paraspinous muscle contractions. (R. at 114.) Dr. Smith also found tenderness of the cervical spine and AC joint, but there was no misalignment, asymmetry, crepitation, tenderness, masses, deformities, or effusions in the right upper extremity, right lower extremity, and left lower extremity. (R. at 114.) Flexion of the head and neck were limited to 25 degrees, extension was limited to five degrees, right rotation was limited to 40 degrees, and left rotation was limited to 30 degrees. (R. at 114.) No limitation of motion of the right upper extremity, left upper extremity, right lower extremity and left lower extremity were found. (R. at 114.) Dr. Smith noted that there was no evidence of dislocation or ligamentous laxity in the right upper extremity, left upper extremity, right lower extremity and left lower extremity. (R. at 114.) The strength of the deltiod and biceps were found to be 4+, the strength of the triceps was found to be 5-, and the strength of the major appendicular muscle groups was found to be 5/5. (R. at 114.) Dr. Smith stated that muscle tone was normal and no atrophy was noted. (R. at 114.)

Upon neurological examination, Dr. Smith found that finger-to-nose testing and rapid alternating hand movements were performed without difficulty and pronato drift was not present. (R. at 114.) Decreased sensation to pinprick diffusley in the lower extremity was also found. (R. at 114.) Dr. Smith noted Pennington's deep tendon reflexes as biceps 3+/2++, triceps 2++/2++, brachioradialis 2++/2++, knee jerks 3+/3+, and ankle jerks trace/trace. (R. at 114.) He also noted no clonus and

bilaterally equivocal Babinski testing. (R. at 114.)

After examining Pennington and reviewing her medical records, Dr. Smith diagnosed her with cervical spondylosis with myelopathy, C4-5, C5-6; cervical stenosis, C4-5, C5-6, with abnormal signal in the spinal cord at C5-6, probably myelomalcia; cervical radiculopathy, left C6; and low back pain, bilateral lower extremity pain, chronic. (R. at 115.) Dr. Smith discussed the various treatment options with Pennington, including continued observation, conservative treatment, and surgical intervention. (R. at 115.) Dr. Smith prescribed Decadron Dosepak, Pepcid, and Lortab to Pennington. (R. at 115.)

On October 16, 2002, Pennington underwent a CT scan and SP myelogram of her cervical and lumbar spine. (R. at 126.) The myelogram showed mild anterior extradural impressions on the thecal sac at L3-4 and L4-5, with the nerve sheaths filling symmetrically at both levels. (R. at 126.) It also showed that the other levels were unremarkable, there was no significant narrowing of the spinal canal, no intrathecal abnormality was appreciated and the conus medullaris was unremarkable. (R. at 126.) Dr. David A. Sparks, M.D., diagnosed Pennington with disc bulge versus central protrusion of disc material at L3-4 and L4-5. (R. at 127.)

The CT lumbar myelogram showed the L2-L3 level unremarkable, but there was a diffuse bulge of the anulus fibrosus with no protrusion of the disc material at L3-4 level. (R. at 127.) Also at that level, the neural foramina were not compromised and the ligamentum falvum and facets were unremarkable. (R. at 127.) Diffuse bulge of the anulus fibrosus with lateral protrusion of disc material extending from the right

lateral recess through the foramen magnum was also noted at the L4-5 level, but there was no protrusion of disc material seen on the left. (R. at 127)  Slight narrowing of the spinal canal was present, as well as hypertrophy of the facet joints, but no significant thickening of the ligamentum falvum was present. (R. at 127.)  There was very mild, broad-based protrusion of disc material posteriorly in the midline at L5-S1, which was abutting, but not displacing or distorting the S1 nerve roots. (R. at 127.)  The spinal canal and neural foramina were of normal dimensions, and the facet joints were unremarkable. (R. at 127.)  Dr. Sparks diagnosed Pennington with lateral disc protrusion on the right at L4-5 with mild canal stenosis, mild canal stenosis at L3-4 due to disc bulge, but no disc protrusion, and mild central posterior protrusion of disc material at L5-S1 of questionable significance. (R. at 127-28.)

The cervical myelogram of Pennington showed prominent anterior impressions on the thecal sac at the C4-5 and C5-6 levels associated with osteophytes, mild anterior impression at C3-4, and poor filling of the nerve root sleeves of the six cervical roots bilaterally. (R. at 128.)  It also showed the nerve sleeves filled symmetrically at other levels and a narrowed spinal canal at C4-5 and C5-6, but it showed no evidence of cord compression. (R. at 128.)  Dr. Sparks diagnosed Pennington with mild spinal canal stenosis at C4-5 and C5-6 due to osteophyte bilateral compression of the sixth cervical nerves. (R. at 128.)

Finally, the CT cervical myelogram of Pennington showed a mild bulge or minimal central protrusion of disc material at C2-3 and C3-4 without compromise of the spinal canal or neural foramina. (R. at 128-29.)  It also showed, at C4-5, osteophyte across the posterior aspect of the disc space causing marked narrowing of

the spinal canal and compression of the spinal cord, slightly more prominent on the
left than the right. (R. at 129.) Further, there was a small amount of soft disc to the
left of midline protruding beyond the osteophyte which caused slightly more
effacement of the thecal sac, but there was no disc material in either neural foramen.
(R. at 129.) There was also osteophytes involving the uncovertebral joints, but no
significant bony stenosis. (R. at 129.) The CT cervical myelogram showed that the
C5-6 disc space was almost obliterated. (R. at 129.) Prominent osteophytic bar was
seen posteriorly, impinging on the thecal sac and narrowing the spinal canal. (R. at
129.) The spinal cord was compressed, there was no associated disc herniation and
osteophytes of the uncovertebral joints were causing moderate narrowing of the
neural foramina bilaterally. (R. at 129.) At the C6-7 level, mild central protrusion
of disc material was seen, but with no significant narrowing of the spinal canal and
no involvement of the neural foramina and no bony foraminal stenosis appreciated.
(R. at 129.) Dr. Sparks noted that C7-T1 was unremarkable and diagnosed
Pennington with spondylosis with canal stenosis and cord compression at C4-5 and
C5-6 with an additional small component of disc herniation to the left of midline at
C4-5. (R. at 129-30.) Dr. Sparks also stated that there was no herniation of disc
material in the neural foramina at either level, but there was some bony foraminal
stenosis bilaterally at C5-6 due to osteophyte. (R. at 130.) Dr. Sparks further
diagnosed Pennington with mild central disc protrusions at C2-3, C3-4 and C6-7,
which were of questionable significance. (R. at 130.)

Pennington visited Dr. Smith on October 29, 2002. (R. at 165-67.) She
complained of persistent neck and left upper extremity pain, chronic low back pain,
and stiffness and gait instability. (R. at 165.) Pennington had returned to Dr. Smith

to review the cervical and lumbar myelogram and to discuss further treatment recommendations. (R. at 165.) Dr. Smith discussed various treatment options with her, including surgical and nonsurgical options. (R. at 166.) Pennington agreed to proceed with ACDF at C4-5 and C5-6 with plating. (R. at 167.)

Pennington again visited Dr. Smith on November 11, 2002. (R. at 107-110.) Dr. Smith noted that Pennington was admitted to undergo an ACDF at C4-5 and C5-6. (R. at 107.)

Upon examination, Pennington had difficulty performing tandem gait, had moderate cervical paraspinous muscle contractions and tenderness of the cervical spine, and had tenderness of the AC joint. (R. at 108-09.) Dr. Smith also noted no misalignment, asymmetry, crepitation, tenderness, masses, deformities or effusions in the right upper extremity, right lower extremity and left lower extremity. (R. at 109.) Dr. Smith determined Pennington's neck extension was limited to five degrees, her neck flexion was limited to 25 degrees, her left rotation was limited to 30 degrees and her right rotation limited to 40 degrees. (R. at 109.) Dr. Smith also found no limitation of motion of the right upper extremity, left upper extremity, right lower extremity and left lower extremity. (R. at 109.)

Upon neurological examination, Pennington performed a finger-to-nose testing and rapid alternating hand movements without difficulty, and pronator drift was not present. (R. at 109.) Dr. Smith found that there was decreased sensation to pinprick diffusely in the left lower extremity and that Pennington's deep tendon reflexes measured 3+/2++ for her biceps, 2++/2++ for her triceps, 2++/2++ for her

-16-

brachioradialis, 3+/3+ for her knee jerks, trace/trace for her ankle jerks and none for her clonus. (R. at 109.) Babinski's tests produced bilaterally equivocal. (R. at 109.)

After examining her and reviewing her records, Dr. Smith diagnosed Pennington with cervical spondylosis with myelopathy, C4-5, C5-6; cervical stenosis, C4-5, C5-6, with abnormal signal in the spinal cord at C5-6, probably myelomalacia; cervical radiculopathy, left C6; low back pain, bilateral lower extremity pain, chronic; and lumbar degenerative disc disease. (R. at 109-10.) Dr. Smith discussed the findings and various treatments with Pennington, including surgery. (R. at 110.) Pennington was recommended that she undergo a lateral cervical spine procedure. (R. at 110.) Pennington was provided with Levaquin and Lortab. (R. at 110.)

From November 12, 2002, until November 14, 2002, Pennington stayed in Holston Valley Medical Center for surgery by Dr. Smith. (R. at 135-43.) The pre- and post-operative diagnoses of Pennington was cervical spondylosis with spinal stenosis and myelopathy C4-5, C5-6. (R. at 135.) A partial corpectomy C5, a partial corpectomy C6 with fusion with the use of ulnar shaft banked bone with anterior cervical diskectomy and fusion at C4-5, and a corpectomy at C6 with the use of Premier plating system was performed on her. (R. at 135.) She underwent the procedure on November 12, 2002. (R. at 135.) Pennington progressed well after the procedure and was discharged on November 14, 2002. (R. at 135.)

On November 20, 2002, Pennington visited Holston Valley Hospital, where her cervical spine was x-rayed. (R. at 120.) The x-ray showed a Morscher plate and screws joining C4, C5, and C6, with a slight reversal of lordosis at the C3-4 level.

(R. at 120.)

That same day, Pennington visited Dr. Smith as a followup to her surgery on November 12, 2002. (R. at 163-64.) Pennington continued to complain of neck pain with radiation bilaterally into the trapezius musculature and into the mid scapular area, but had interval improvement in her upper extremity pain. (R. at 163.) Pennington said that overall she felt that she was progressing well. (R. at 163.) After examination, Dr. Smith diagnosed Pennington with cervical spondylosis with myelopathy, C4-5, C5-6, operated with symptomology resolving; cervical stenosis, C4-5, C5-6, with abnormal signal in the spinal cord at C5-6, probably myelomalcia, operated and clinically improving; cervical radiculopathy, left C6, improving; low back pain, bilateral lower extremity pain, chronic, stable; and lumbar degenerative disc disease. (R. at 164.) No changes were made to Pennington's therapy or medication regimen. (R. at 164.)

On December 19, 2002, Pennington visited Holston Valley Hospital, where her lateral cervical spine was x-rayed. (R. at 119.) The x-ray examined Pennington's anterior cervical disc fusion at C4-C5 and C5-6 and showed that the anterior plate and screws remained in good position, the graft heights were normal and the alignment was satisfactory. (R. at 119.) The opinion was that the anterior cervical disc fusion C4-5 and C5-6 was satisfactory. (R. at 119.)

On December 19, 2002, Pennington also visited Dr. Smith. (R. at 161-62.) Dr. Smith noted that Pennington was status post anterior cervical discectomy and fusion. (R. at 161.) Pennington denied any radicular symptomatology or paresthesis

-18-

involving the bilateral upper extremities, but complained of mild intermittent posterior cervical pain. (R. at 161.) Dr. Smith noted that overall Pennington was pleased with the outcome of her surgery. (R. at 161.)

Still, Pennington reported a longstanding history of lumbar difficulties, with chronic low back pain accompanied by weakness of her lower extremities with associated unsteadiness over the previous year. (R. at 161.) Pennington also complained of sharp shooting pains radiating into both lower extremities as well as intermittent cramping of her left lower extremity, which she said frequently woke her at night. (R. at 161.) However, Pennington was not able to identify any specific muscle group weakness, gait abnormalities, or bowel or bladder dysfunction. (R. at 161.)

Upon examination, Dr. Smith found no evidence of dislocation or ligamentous laxity in the right upper extremity, left upper extremity, right lower extremity and left lower extremity. (R. at 161.) Dr. Smith also found that Pennington's muscle strength was 5+ and her muscle tone was normal. (R. at 161.) He noted no atrophy in the head, neck, right upper extremity, left upper extremity, right lower extremity and left lower extremity. (R. at 161.) Dr. Smith found intermittent subjective hypesthesia of the bilateral lower extremities involving the entire leg below the patellar region. (R. at 162.) Dr. Smith found Pennington's deep tendon reflexes for her biceps to be 2++/2++, triceps 2++/2++, brachioradialis 3+/3+, knee jerks 3-/3+ and ankle jerks 2+2+. (R. at 162.) The examination also revealed positive Hoffman's on the left and Babinski testing produced bilaterally equivocal. (R. at 162.)

Dr. Smith diagnosed Pennington with cervical spondylosis with myelopathy, C4-5, C5-6, operated with symptomology resolving; cervical stenosis, C4-5, C5-6, with abnormal signal in the spinal cord at C5-6, probably myelomalcaia, clinically improving and operated; cervical radiculopathy, left C6, improved; low back pain, bilateral lower extremity pain, chronic; and lumbar degenerative disc disease. (R. at 162.)  The findings and various treatment options were discussed in detail with Pennington, including the fact that she may continue to have some degree of pain, weakness or numbness regardless of the treatment option selected.  (R. at 162.) Pennington was advised to avoid traumatic flexion/extension or flexion loading of the spine.  (R. at 162.)

On January 21, 2003, Pennington visited Dr. Molony.  (R. at 95.)  Dr. Molony noted that she had a past history of widespread arthritis, old trauma from an accident, recent neck surgery with fusion of C-2 through 7 with plate and screws.  (R. at 95.) Dr. Molony also noted that Pennington told him that she had a lot of spinal damage. (R. at 95.)  Dr. Molony refilled her hydrocodone but reduced it to 5 mg. t.i.d., with no refills, refilled her Carisoprodol, and started her on Atenolol.  (R. at 156.)

On February 3, 2003, Pennington visited Holston Valley Hospital, where her lateral cervical spine was x-rayed.  (R. at 118.)  The x-ray showed her anterior cervical disc fusions at C4-5 and C5-6.  (R. at 118.)  The anterior plate and screws were seen on the x-ray, and it showed that alignment remained satisfactory with no significant change as compared with the December 9, 2002 and the November 11, 2002 x-rays.  (R. at 118.)  The opinion was that the anterior cervical disc fusions at C4-5 and C5-6 were stable.  (R. at 118.)

On February 21, 2003, Pennington returned to Dr. Molony, complaining of pain in her lower back and neck. (R. at 94.) Dr. Molony noted that Pennington underwent surgery on her cervical spine with Dr. Ken Smith, that Pennington had a myelogram which showed disc bulging, and that Pennington had no money and wanted to try to get some help so she could get further surgery. (R. at 94.) Dr. Molony diagnosed her with hypertension, poorly controlled, neck pain with surgery, low back pain and arthritis. (R. at 94.) Dr. Molony prescribed her with Norvasc and Atenolol. (R. at 155.)

On March 20, 2003, a Physical Residual Functional Capacity Assessment was completed by Dr. Donald R. Williams, M.D., a state agency physician. (R. at 144-51.) Dr. Williams found that Pennington could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, could stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, sit with normal breaks for a total of about six hours in an eight-hour workday, and could push and/or pull (including operation of hand and/or foot controls) an unlimited amount other than as shown for lift and/or carry. (R. at 145.) Dr. Williams found no postural, manipulative, visual, communicative or environmental limitations. (R. at 146-48.)

On April 22, 2003, Pennington returned to Dr. Molony, complaining of cold symptoms and pain in her low back and hips. (R. at 154.) Pennington said that she could not sleep due to the pain and that her nerves were "shot." (R. at 154.) Pennington said that she was going to reschedule an appointment with her orthopedics. (R. at 154.) Dr. Molony also noted that Pennington was going through

-21-

a divorce at that time. (R. at 154.) Dr. Molony diagnosed her with hypertension, poorly controlled, low back pain, bilateral hip pain, neck pain, arthritis and anxiety depression. (R. at 154.) He prescribed her with hydrocodone, Carisoprodol, alprazolam and Norvasc, and noted that she was going through a divorce. (R. at 154.)

Pennington again returned to Dr. Molony on June 20, 2003. (R. at 153.) Pennington complained of pain in her low back, hips and neck, as well as widespread arthritis. (R. at 153.) Dr. Molony diagnosed her with hypertenstion, low back pain, bilateral hip pain, neck pain, arthritis and anxiety depression. (R. at 153.) He also refilled her prescription for hydrocodone, alprazolam and Carisoprodol, and noted that Pennington had lost six and a half pounds and was trying to walk every day. (R. at 153.)

Pennington next visited Dr. Molony on August 18, 2003, because she had run out of Norvasc. (R. at 152.) Dr. Molony gave her some samples of Norvasc and a prescription for hydrocodone and alprazolam. (R. at 152.) He diagnosed Pennington with hypertension, low back pain, bilateral hip pain, neck pain, arthritis and anxiety depression and noted that she had lost a little more weight. (R. at 152.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a

severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2004). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2004).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 23, 2003, the ALJ denied Pennington's claim. (R. at 16-22.) The ALJ found that Pennington had not engaged in substantial gainful activity since the alleged onset of disability and that Pennington had chronic neck and back pain, both of which were impairments considered "severe" based on the requirements in 20 C.F.R. § 416.920(b) (2004). (R. at 21.) The ALJ determined that these impairments did not meet or medically equal a listed impairment found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ also determined that Pennington's allegations regarding her limitations were not totally credible. (R. at 21.) The ALJ stated that he had carefully considered all of the medical opinions in

the record regarding the severity of Pennington's impairments. (R. at 22.) The ALJ then found that Pennington retained the residual functional capacity to perform work at the light level of exertion that would allow for frequent postural changes. (R. at 22.) The ALJ determined that Pennington was unable to perform any of her past relevant work and that she had no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case. (R. at 22.) Considering Pennington's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed which Pennington could perform. (R. at 22.) He concluded that Pennington was not under a "disability," as defined by the Act, at any time through the date of the decision. (R. at 18.) *See* 20 C.F.R. § 416.920(g) (2004).

Pennington argues that substantial evidence does not support the ALJ's decision. Specifically, she argues that the ALJ erred in failing to properly apply the pain standard and the ALJ erred in failing to develop the record regarding Pennington's alleged mental impairment. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), (Docket Item No. 14), at 7.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and

his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

First, Pennington argues that the ALJ failed to properly apply the pain standard because "the [ALJ] stated that the claimant did not suffer from an impairment which could cause the amount of pain alleged because [Pennington] had never sought the services of a specialist." (Plaintiff's Brief at 7.) Specifically, Pennington argues that she continued to seek treatment for pain, took prescribed pain medication, avoided all activities which caused the pain to be worse, had muscle weakness, decreased range of motion and numbness, and did not seek further treatment for pain due to financial constraints. (Plaintiff's Brief at 9.)

"Pain itself can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). The determination of whether a claimant is disabled by pain or other subjective symptoms is a two-step process under the Act. *See Craig v. Chater*, 76

-25-

F.3d 585, 594-95 (4th Cir. 1996); 20 C.F.R. § 416.929(b), (c) (2004). First, there must be objective medical evidence showing the existence of an impairment that could reasonably be expected to produce the actual pain, in the amount and degree alleged by the claimant. *See Craig*, 76 F.3d at 594-96. Only after the existence of such an impairment is established must the ALJ consider the intensity and persistence of the claimant's pain and the extent to which it affects the ability to work. *See Craig*, 76 F.3d at 594-95. Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence. *See Craig*, 76 F.3d at 595. Evidence of a claimant's activities as affected by the pain is relevant to the severity of the impairment. *See Craig*, 76 F.3d at 595.

Furthermore, an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). "Subjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." *Parris v. Heckler*, 773 F.2d 324, 327 (4th Cir. 1984). Protection of a claimant's power to establish the existence of disabling pain even without objective evidence of the pain's severity ensures the claimant only the opportunity to persuade the ALJ; it does not, obviously, ensure a favorable result for the claimant. As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding his pain are for the ALJ to make. *See Shively*, 739 F.2d at 989-90 (affirming ALJ's decision to discredit claimant's testimony as to pain that was out of proportion with objective evidence because the court was persuaded that ALJ considered the

testimony).  To hold that an ALJ may not consider the relationship between the objective evidence and the claimant's subjective testimony as to pain would unreasonably restrict the ALJ's ability to meaningfully assess a claimant's testimony.

As noted by the ALJ, (R. at 20), the record indicates that Pennington's impairments improved after surgery.  On November 20, 2002, Dr. Smith noted that Pennington was "clinically improving" and "progressing well" after her surgery. (R. at 163-64.)  On December 19, 2002, Dr. Smith again found that Pennington was "clinically improving," and reported that Pennington was "pleased with the outcome of [her] surgery." (R. at 161-62.)  Further, a February 3, 2003 x-ray showed that the cervical disc fusions at C4-5 and C5-6 were stable. (R. at 118.)  However, on February 21, 2003, Pennington complained to Dr. Molony of pain in her lower back and neck and said that she was not able to afford any more surgery.  (R. at 94.) Pennington also complained to Dr. Molony of pain in her lower back and hips on April 22, 2003, and June 20, 2003. (R. at 153-54.)

In rendering his decision, the ALJ specifically addressed Pennington's allegations of pain.  The ALJ stated,

> "[a]lthough the claimant has musculoskeletal impairments that could reasonably be expected to cause some pain or discomfort, the medical evidence indicates that the claimant's symptoms improved after surgery. Following her surgery, the medical record fails to reveal findings to support pain to the degree alleged.  No physician has indicated that the claimant was totally disabled."

(R. at 20.)  There are several references in the record to Pennington's impairments

improving after her November 2002 surgery, and no physician stated that she was totally disabled from her impairments. The record also indicates that Pennington had begun walking and losing weight after her surgery. (R. at 152-53.) Objective evidence supports the ALJ's decision with respect to Pennington's allegations of pain. This is further substantiated by the determination of the state agency physician, who concluded that Pennington could perform work at the light level of exertion. (R. at 145-48.) Thus, in light of the evidence in the record and the weight this court is required to give the ALJ's credibility determination, see *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984), it is this court's decision that the ALJ's decision with regards to Pennington's allegations of pain is supported by substantial evidence.

Pennington next argues that the ALJ failed to develop the record with respect to Pennington's alleged mental impairment. (Plaintiff's Brief at 9.) Specifically, Pennington argues that the "ALJ has a heightened duty to develop the record in cases involving mental impairments where there is some objective evidence of a mental impairment that could have a material impact on disability," and that such objective evidence was in the record. (Plaintiff's Brief at 9-10.)

The ALJ "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record . . . ." *Cook v. Heckler*, 738 F.2d 1168, 1173 (4th Cir. 1986). The regulations require only that the medical evidence be complete enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability, and the claimant's residual functional capacity. *See* 20 C.F.R. § 416.913(e) (2004). However, as in all Social Security cases, the claimant bears the burden of bringing forth the evidence to prove

-28-

her disability. 20 C.F.R. §§ 416.912, 416.913(d) (2004). A mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand. *See Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

The medication records which Pennington cites indicate that Dr. Molony prescribed alprazolam to Pennington on April 22, 2003, June 20, 2003 and August 18, 2003. (R. at 152-54.) Dr. Molony also noted that Pennington said her nerves were "shot" and she was going through a divorce. (R. at 154.) As the ALJ indicated, however, Pennington's alleged mental impairments have not resulted in hospitalization or even in a referral to a mental health specialist.

Based on the above, the court finds that substantial evidence exists in the record and supports the ALJ's finding that Pennington was capable of work at the light level of exertion that allows for frequent postural changes, and, therefore, was not disabled.

*IV. Conclusion*

For the foregoing reasons, this court will deny Pennington's Motion for Summary Judgment, grant the Commissioner's Motion for Summary Judgment and affirm the Commissioner's decision denying benefits.

An appropriate order will be entered.

DATED:    This _24_ day of May, 2005.

-29-

GLEN M. WILLIAMS
Senior United States District Judge

-30-